MEMPHIS BANK & TRUST COMPANY,
Plaintiff–Appellee,

v.

WATER SERVICES, INC. and Jere
Imboden, Defendants–Appellants.

Supreme Court of Tennessee,
· at Jackson.

Sept. 19, 1988.

Jerry F. Taylor, Wilkes, McCullough & Taylor, Memphis, for defendants-appellants.

Jerry E. Mitchell, Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, for plaintiff-appellee.

## OPINION

HARBISON, Chief Justice.[1]

Appellee is the owner of a large commercial bank building in downtown Memphis, Tennessee. It brought this products liability action against a corporation which operates a commercial and industrial water treatment business and against its sales representative. The claim was for damage to the windows and aluminum siding on one side of the tower of the office building. This area had become discolored by escaping chemical-laden water from the cooling towers of the air conditioning systems in the building.

The action was tried without a jury. At the conclusion of a lengthy hearing the trial judge dismissed the suit, which had been brought on a number of theories, including breach of warranty, negligence and strict liability in tort. The action was, therefore, a "products liability action" within the meaning of T.C.A. § 29–28–102(6).

The Court of Appeals reversed the judgment of the trial court and rendered judgment for the plaintiff against both defendants on the theory of "strict liability." The Court of Appeals did not reverse the judgment of the trial court in dismissing the negligence and breach of warranty claims, and no issue with respect to those claims has been made in the appeal to this Court.

Unfortunately the parties did not cite to the Court of Appeals the Tennessee Products Liability Act of 1978, nor were any

1. This case was originally assigned to Chief Justice Ray L. Brock, Jr. for preparation of the opinion. After the oral arguments in the case, however, Chief Justice Brock retired. The case was subsequently reassigned for preparation of the opinion, and Chief Justice Brock did not participate in the final disposition.

cases subsequent to that act or interpreting its provisions cited in the briefs in the Court of Appeals or in the opinion of that court. When review was sought here, this Court directed the parties to brief the question of whether the provisions of that statute were applicable. Both have agreed that the case is controlled by the provisions of that statute insofar as the claim of strict liability is concerned. The first contact between these parties occurred in August 1978, after the effective date of the statute, and performance of the contract between them commenced in the summer of 1979. The parties, therefore, are correct in their agreement that the statute controls this case, and we will dispose of it accordingly.

Under the terms and provisions of the statute there can be no claim against the defendant Imboden, against whom a personal judgment of $78,808.00 was imposed by the Court of Appeals for damage to the building. Mr. Imboden is shown by the uncontradicted evidence in this case to be a sales representative of the corporate defendant. On all sales made for his employer he was paid a commission. He was neither a stockholder, a director nor an officer of the corporate defendant, insofar as the record shows. The corporation is clearly both a "manufacturer" and a "seller" within the meaning of T.C.A. §§ 29–28–102(4) and (7). Mr. Imboden was neither. Further, even if he were to be deemed a "seller" of products which did not belong to him, there is no evidence that he was a "manufacturer." Under the terms of T.C.A. § 29–28–106(b) such a seller is not liable under "the doctrine of strict liability in tort" unless he is also the manufacturer or unless the manufacturer is insolvent or not amenable to service of process in this state. Accordingly, the judgment against Mr. Imboden personally is set aside and the action as to him is dismissed.

Appellant Water Services, Inc. concedes that it is subject to the terms and provisions of the statute as a seller and manufacturer. Its only business is the treatment and purification of water for commercial and industrial uses. In this connection it makes chemical analyses of water samples for commercial air conditioners, boilers and manufacturing and industrial installations. It then prescribes and furnishes chemical compounds to control the alkalinity, acidity or other properties of the water. It also supplies equipment, which it purchases from others, to control the blending of its products and their dissolution in water running through air conditioning systems and similar installations. It does not manufacture, maintain or repair the industrial equipment of its customers. If its representatives perceive some problem with the equipment of a customer, they call the matter to the attention of the customer, but in all cases they recommend that the customer correct any problems in its equipment or consult other contractors and suppliers for that purpose.

The proof clearly shows that the chemical compounds prescribed by Water Services, Inc. and the course of treatment utilized by it in this case were standard and comported with normal practices in the industry. In the ordinary sense of the terms, there is no evidence that any of the chemical compounds sold by appellant and installed in the water servicing the air conditioners of appellee were "defective" or "unreasonably dangerous." These chemicals were designed to eliminate algae, scaling and corrosion which had developed over a period of many years on two water cooling towers located on the roof of the second story of the bank building.

Under its contract with appellee, Water Services, Inc. was to provide monitoring of the system, which was to be operated by personnel in the maintenance division of the bank. Mr. Imboden was required to inspect the system at intervals of four to six weeks and to make adjustments in the amounts of chemicals fed into the water system in accordance with tests of the circulating water. That he did this without complaint is uncontradicted in the record, and the former building superintendent of appellee testified that Mr. Imboden "did a good job."

At the time when Mr. Imboden was first contacted by the building superintendent of the bank, both water cooling towers were

in a very bad state of repair. The larger one, servicing a 300–ton unit, had been installed in 1963. This unit was used only during seasons of warm weather and was shut down during the fall and winter. A smaller 60–ton unit serviced data processing equipment in the bank and was utilized throughout the year.

At the time when Mr. Imboden first saw the towers, each was leaking excessively at the base and at the top. The purpose of such towers is to permit heated water to drop or splash through a series of slats, or "fills", under a draft of air supplied by a ventilating fan. When the units are in proper repair, only a minimum amount of water escapes from the top and practically none from the bottom. Essentially all that is discharged through the top of the units is water vapor, and not a liquid.

Both of these towers, however, for years prior to the first contact between the parties to this case, had emitted a substantial "spray" of liquid from the top, keeping one side of the building and the roof very wet and spraying onto cars in an adjacent parking garage. This condition was not only well known to the personnel of the bank, but it was expressly called to their attention by Mr. Imboden with the strong recommendation that contractors or suppliers skilled in the maintenance or replacement of water towers be consulted to correct the situation.

One of the chemical compounds supplied by appellant was a chromate, which added a yellow color to the air conditioning water. Mr. Imboden specifically advised the building superintendent of appellee that the spraying and spotting problem which the bank was already experiencing could be enhanced by the addition of the chromate compound.

Responding to the recommendation of Mr. Imboden, the building superintendent obtained estimates from three contractors for the repair or replacement of the water towers. The company which had installed the towers again inspected them and found them in such poor repair that it recommended that both be replaced. Quotations from this supplier are in the record. For a sum of about $15,000.00 both towers could

have been replaced by this supplier, or if the bank had used its own labor for installation, the towers could have been purchased for about two-thirds of that amount.

The manufacturer's catalogs accompanying the proposal show that from the top of a new or well-maintained cooling tower, less than .2% liquid would escape into the atmosphere. Water escaping from the top of such a tower is referred to in the literature as "drift", and cooling towers are equipped with "drift eliminators" to minimize or eliminate escaping liquid. It is uncontradicted that from 40 to 50% of the "drift eliminators" on appellee's existing large tower were missing when Mr. Imboden first saw the unit in 1978, and the record does not establish that they were ever repaired or replaced.

For reasons not explained in the record, officials of the bank declined to replace either tower. Apparently some minimal repairs, such as replacement of missing or decayed slats and the insertion of pitch into the bottom of the towers, were made. No attempt appears to have been made by the bank, however, to eliminate or minimize the excessive "drift" or escaping liquid at the top of either tower. This problem continued for the next two years after appellant's system was installed.

In late 1981 officials of the bank noted that windows on the east side of the bank, near the cooling towers, had become covered with a film. During the spring of 1982, it was also discovered that the aluminum spandrels, or panels, on the exterior of that side of the building had also become discolored and had a yellow appearance.

Upon being notified of this condition, Mr. Imboden attempted to clean the windows with various chemical compounds, but he was only partially successful in finding a process which would clean the windows. This proved to be impractical or excessively costly in the opinion of the banking officials, although there was testimony from a commercial vendor that the windows might be cleaned for about $19,000.00. A glass company inspected the windows at the request of the bank and concluded that replacement would be more practical and less expensive than attempting to clean the win-

dows in place. Another contractor testified that the aluminum spandrels could not be cleaned satisfactorily and also needed to be replaced.

It is undisputed that escaping water from the cooling towers splashed onto the sides and windows of the bank building and that the chromate contained in the materials furnished by appellant added the yellowing color or stain. It does not appear, however, that any of the compounds furnished by appellant would have permanently "etched" the window glass. This condition appears to be the result of alkalinity, rather than acidity, of the water in the air conditioning system. Chromate, in and of itself, is soluble in water. Another chemical furnished by appellant was mild sulfuric acid, but this chemical, again, is not harmful to window glass and is not shown to have been the cause of the problem with the windows.

▪ The Court of Appeals was of the opinion that the "warnings" given by appellant, through Mr. Imboden, were not sufficient, in that they did not contain any statement that there might be permanent damage to the building. Because of failure to warn of this "possibility", appellant was held liable for furnishing chemicals which were deemed unreasonably dangerous under the doctrine of strict liability.

We respectfully disagree. In our opinion, the warnings were quite adequate under the terms and provisions of T.C.A. § 29–28–105 and under the facts of this case. T.C.A. § 29–28–105(d) provides:

A product is not unreasonably dangerous because of failure to adequately warn of a danger or hazard that is apparent to the ordinary user.

The customer in this case was a commercial bank, not a private individual. The chemicals furnished in this case were not, in and of themselves, unreasonably dangerous. It is conceded by appellee that they were not "defective." In *Pemberton v. American Distilled Spirits Company*, 664 S.W.2d 690 (Tenn.1984) this Court held that in determining whether a product was defective or unreasonably dangerous because of inadequate warning, an objective standard must be utilized; that is, the knowledge and experience of an ordinary consumer of the product, rather than a particular plaintiff, must be considered.

The sophistication or immaturity of the expected user may, of course, legitimately be considered by a trier of fact in determining whether a warning was or was not adequate. *See Evridge v. American Honda Motor Co., Inc.*, 685 S.W.2d 632 (Tenn. 1985). Under the Tennessee Products Liability Act, a product is unreasonably dangerous when it

... is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition. T.C.A. § 29–28–102(8).

In the present case, the purchaser of the products and services furnished by appellant was a commercial bank with its own building superintendent and permanent maintenance crew. The fact that the bank had water towers which were dangerously leaking at both the bottom and top was called to the attention of these persons. The building superintendent was concerned to the extent of taking bids for the replacement or repair of the cooling towers. Higher officials of the bank rejected these proposals, and only makeshift repairs were ever made. For more than two years appellee attempted to continue to use the defective towers without any substantial repair or maintenance. Finally appellee discontinued use of the smaller tower and ultimately replaced the larger one entirely in 1984.

T.C.A. § 29–28–108 provides:

If a product is not unreasonably dangerous at the time it leaves the control of the manufacturer or seller but was made unreasonably dangerous by a subsequent unforeseeable alteration, change, improper maintenance or abnormal use, the manufacturer or seller is not liable.

In our opinion, the evidence does not preponderate against the findings of the

trial judge that adequate warnings were given by appellant of the potential danger of staining the building if appellee utilized appellant's products without substantially repairing, renovating or replacing the water cooling towers. Appellee chose not to do so, but permitted the towers to continue in a state of improper maintenance and repair until the damage was done. As previously stated, appellant does not install, repair, maintain or locate water towers. All that it could do was to refrain from making sales at all, or to recommend that appellee consult with persons able to make the proper repairs on the bank's equipment.

Under the provisions of the Tennessee Products Liability Act of 1978, now conceded by both parties to be controlling, in our opinion the appellant is not liable for the damage complained of in this case. The judgment of the Court of Appeals is reversed and that of the trial court is reinstated. All costs are taxed to appellee. The cause will be remanded to the trial court for collection of costs accrued there and for any further proceedings which may be necessary.

FONES, COOPER and DROWOTA, JJ., concur.